IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

THOMAS COLE

:

v.                              : Civil Action No. DKC 2006-1554

:

RICHARD C. CATERISANO

:

## MEMORANDUM OPINION

Presently pending and ready for resolution in this review of a denial of naturalization case is the motion of Respondent Richard C. Caterisano, District Director of United States Citizenship and Immigration Service ("USCIS"), for summary judgment.  (Paper 6). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the reasons that follow, Respondent's motion will be denied.

## I.   Background

The following facts are either undisputed or are construed in the light most favorable to Petitioner Thomas Cole.  Petitioner is a native of Sierra Leone.  He entered the United States as a lawful permanent resident on July 29, 1994.  (*See* Paper 6, Ex. 1).  He filed an application for naturalization, form N-400, on March 12, 2003, with the Baltimore Office of the USCIS.

On October 21, 2003, Petitioner appeared for an examination under oath regarding his application for naturalization.  The examiner reviewed the application orally with Petitioner, making corrections when necessary to reflect the Petitioner's oral

changes.  The changes were numbered in red ink on the application.

(Paper 6, Ex. 2).  USCIS denied Petitioner's application for

naturalization because it determined that he had provided false

testimony during his naturalization interview regarding certain

aspects of his family history, including how many children he had

and whether he provided support for them.  (Paper 6, Ex. 3).

Petitioner has had a somewhat complicated family history.  In

his verified petition, Petitioner explains that he has fathered

eight children.[1]  (Paper 1 ¶ 5).  Two of his children, Sydney and

Margaret, are deceased and one, Eugenia, has been missing since

---

[1]

| Child | Date of Birth | Mother | Country of Birth |
|-------|---------------|--------|------------------|
| Margaret Cole | 06/20/1972 (deceased) | Record not definitive | Sierra Leone |
| Sydney Cole | 04/04/1973 (deceased) | Not in record | Sierra Leone |
| Clifford Cole | 07/21/1984 | Record not definitive | Sierra Leone |
| Triphena Cole | 05/09/1987 | Marie (Mary) Cole | Sierra Leone |
| Eugenia Cole | 03/31/1988 (missing since 1994) | Joyce Tucker | Sierra Leone |
| Cathay Cole | 04/10/1989 | Marie (Mary) Cole | Sierra Leone |
| Taiwo Cole | 09/24/1992 | Eugenia O'Rielly | United States |
| Nancy Cole | 04/27/1994 | Eugenia O'Rielly | United States |

(*See* paper 1 ¶¶ 5, 7; *see also* paper 6, Ex. 2, at 6).

2

1994 and is presumed deceased.  (*Id.*).  When Petitioner entered the country in 1994, he was unaware that he was the father of two additional children, Triphena and Cathay.  (Paper 6, Ex. 4, at 2). He therefore did not know to list the additional children on his Application for an Immigrant Visa in 1994.  Petitioner became aware of these daughters sometime after 1996, when the girls' biological mother went missing and Petitioner's mother took responsibility for the girls.  (*Id.*).  Petitioner has two more children, Nancy and Teiwoh, who were born in the United States.  (Paper 1 ¶ 5).

During his first naturalization interview, Petitioner told the hearing officer that he had six children.  The USCIS officers noticed that Triphena and Cathay were not listed on Petitioner's Application for an Immigrant Visa, and they interpreted the discrepancy between Petitioner's applications as a false statement. (Paper 6, Ex. 3, at 2-3).  Petitioner was provided a 30-day continuance to produce Triphena and Cathay's birth certificates. He submitted the certificates, which were registered May 7, 2001. (*Id.* at 3).  The USCIS refused the late registrations as evidence that Petitioner was the girls' biological father.  The officers also found that Petitioner failed to prove that he had supported these children. (*Id.*).  Accordingly, the USCIS found Petitioner ineligible for naturalization.  (*Id.* at 4).  Petitioner then filed a request for a rehearing with the USCIS and filed form N-336,

submitting a statement in support of his request.  (*See* Paper 6, Ex. 4).

On February 2, 2006, Petitioner had a rehearing before a different examiner.   During the interview, Petitioner again informed the examiner that he had six children.   The examiner asked about a child named Eugenia Cole, because she was not listed on his N-400, yet she was claimed on his earlier Application for an Immigrant Visa.  (Paper 6, Ex. 5, at 2).   The N-400, part 9A asks "[how] many sons and daughters have you had?" (Paper 6, Ex. 2, at 6).   Petitioner wrote the number "six" in response, and then listed seven names below, with one daughter, Sydney, marked as deceased. When asked about Eugenia, Petitioner recanted, and implied that Eugenia would make "seven."   (Paper 6, Ex. 5, at 2).   Petitioner explained that Eugenia has been missing since 1994 and presumed dead, as a result of the 1991-2001 civil war in Sierra Leone.

In a decision dated February 17, 2006, the USCIS again denied Petitioner's naturalization application.   The USCIS found that Petitioner had failed to establish that he was Eugenia's biological father.   Further, the USCIS found that Petitioner failed to financially support Eugenia.   The denial also explained that Petitioner provided inconsistent proof regarding Triphena and Cathay's mother, which amounted to inconclusive evidence of the girls' birth.   The birth certificates listed the girls' mother as "Marie Cole," not "Mary Cole," as Petitioner had testified.   The

4

denial also reported that Petitioner had referred to *his* mother as Marie Cole.   The USCIS concluded that Petitioner had not established that he had not given false testimony regarding his biological children and had not supported his children and thus was ineligible for naturalization.  (*Id.*).

The USCIS also ruled that Petitioner had failed to establish that he had not practiced polygamy.  (Paper 6, Ex. 5, at 4).  The hearing officer found that Petitioner was married to Eugenia O'Rielly from September 25, 1987 until August 29, 1990.  During that time, Petitioner fathered three children by Mary Cole, who carried Petitioner's last name.  The USCIS found that it appeared as though Petitioner was married concurrently to Ms. O'Rielly and Ms. Cole and he failed to provide evidence to disprove the implication of polygamy.  (*Id.*).  Petitioner was therefore ineligible for naturalization because polygamy is a bar to a finding of good moral character under 8 C.F.R. § 316.10 (b)(2)(ix).

The hearing officer also found that while Petitioner was married to his second wife, Mona Gaffney, he had an extramarital affair with Eugenia O'Rielly that tended to destroy his marriage to Ms. Gaffney.  (Paper 6, Ex. 5, at 3).  As having an extramarital affair that tends to destroy an existing marriage bars a finding of good moral character under 8 C.F.R. § 316.10 (b)(3)(ii), the USCIS denied Petitioner's application.  (*Id.*).

Petitioner then timely filed a Petition for Review of the USCIS's denial of his naturalization application in this court.  In his verified petition, Petitioner recounts that he did not originally list Eugenia on his application for naturalization because she had been missing and presumed dead since 1994.  However, at the interview, he told the hearing officer about Eugenia's likely fate.  As Eugenia has been missing since 1994, Petitioner has not been able to support her.  Petitioner explains that Eugenia's mother was Joyce Tucker, not Mary Cole, as noted by the hearing officer.  Joyce Tucker is also missing and presumed dead.  (Paper 1 ¶ 7).

Regarding the USCIS's conclusions regarding Cathay and Triphena, Petitioner asserts in his petition that Mary Cole is the girls' mother.  He made the same assertion in an affidavit to the USCIS.  The "Marie Cole" listed as the mother of Triphena and Cathay on their birth certificates is the same person as Mary Cole.  Petitioner uses the names "Mary" and "Marie" interchangeably.  Like Eugenia Cole and Joyce Tucker, Mary Cole is missing as a result of the civil war.  (Paper 1 ¶ 7).  Petitioner proffers further explanation in his Response to Respondent's Motion for Summary Judgment.  Petitioner's stepmother is also named Marie Cole.  This Marie Cole took custody of Triphena and Cathay after Mary Cole disappeared.  (Paper 8 ¶ 3).

In his verified petition, Petitioner asserts that he was married to Eugenia O'Rielly from September 25, 1987 until August 29, 1990.  His marriage to Ms. O'Rielly was strained by the interference of her parents and the couple separated shortly after they married.  During the separation, Petitioner began a relationship with Mary Cole, with whom he fathered Triphena and Cathay.  Petitioner and Ms. Cole were never married; the fact that they have the same surname is a coincidence.  Petitioner married Mona Gaffney on September 20, 1990, after finalizing his divorce with Ms. O'Rielly.  Petitioner and Ms. Gaffney struggled with cultural differences and eventually separated.  While separated from Ms. Gaffney, Petitioner renewed his relationship with Ms. O'Rielly, who had also come to live in the United States.  Ms. Gaffney and Petitioner divorced and Petitioner remarried Ms. O'Rielly, now known as Eugenia Cole.  (Paper 1 ¶ 7).

Respondent filed a motion for summary judgment on November 17, 2006.  In his motion, Respondent alleges that Petitioner's application was properly denied because Petitioner lacks good moral character.  Specifically, Respondent asserts that Petitioner, (1) through false statements made with the intention to obtain immigration benefits, failed to reveal all of his children, (2) failed to support his daughter Eugenia Cole, and (3) failed to establish proof that his extramarital affairs did not destroy his existing marriages.

## II.   Standard of Review

Pursuant to 8 U.S.C. § 1421(c) (2000), this court reviews USCIS's denials of applications for naturalization *de novo*.

> A person whose application for naturalization under this subchapter is denied after a hearing before an immigration officer under section 1447(a) of this title, may seek review of such a denial before the United States District Court for the district in which such person resides in accordance with chapter 7 of title 5.  Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

8 U.S.C. § 1421(c); *see also Epie v. Caterisano*, 402 F.Supp.2d 589, 590-91 (D.Md. 2005).  Judicial review of naturalization denials "is not limited to any administrative record but rather may be on facts established in and found by the district court de novo." *Aparicio v. Blakeway*, 302 F.3d 437, 445 (5th Cir. 2002).  In reviewing naturalization denials, the district court does not defer to the USCIS's findings of fact or conclusions of law. *See Chan v. Ganter*, 464 F.3d 289, 291 (2d Cir. 2006) (citing *United States v. Hovsepian*, 359 F.3d 1144, 1162 (9th Cir. 2004)).  As noted by the Tenth Circuit, "[t]his grant of authority is unusual in its scope – rarely does a district court review an agency decision de novo and make its own findings of fact." *Nagahi v. INS*, 219 F.3d 1166, 1169 (10th Cir. 2000).

In a naturalization proceeding, the petitioner bears the burden of proving the existence of the requisite qualifications.

8 U.S.C. § 1421(c); *see also Berenyi v. District Director*, 385 U.S.
630, 636-37 (1967).  All doubts are to be resolved in favor of the
government.  *Berenyi*, 385 U.S. at 636-37.

A finding of good moral character is required to be eligible
for naturalization.  *See* 8 U.S.C. § 1427(a).

## III. Analysis

It is well established that a motion for summary judgment will
be granted only if there exists no genuine issue as to any material
fact and the moving party is entitled to judgment as a matter of
law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986).  In other words, if there clearly exist factual issues "that
properly can be resolved only by a finder of fact because they may
reasonably be resolved in favor of either party," then summary
judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also*
*Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir.
1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir.
1979).  The moving party bears the burden of showing that there is
no genuine issue as to any material fact and that he is entitled to
judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian
Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.
1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must
construe the facts alleged in the light most favorable to the party

9

opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The parties do not contest that Petitioner meets the requirements for naturalization other than that for good moral character.  *See* 8 U.S.C. § 1427(a).  Therefore, for this court to grant summary judgment, Respondent must establish that there is no issue of material fact as to Petitioner's good moral character.

10

## A.  Good Moral Character

"Good moral character" is defined in 8 U.S.C. § 1101(f)(6):

> No person shall be regarded as, or found to be,
> a person of good moral character who, during
> the [statutory] period for which good moral
> character is required to be established, is, or
> was . . . (6) one who has given false testimony
> for the purpose of obtaining any benefits under
> this chapter.

USCIS has published regulations that further define a lack of good moral character.  *See* 8 C.F.R. § 316.10(b).  The regulations preclude a finding of good moral character if the applicant has "[w]illfully failed or refused to support dependents;" or "[h]ad an extramarital affair which tended to destroy an existing marriage," in the absence of extenuating circumstances.  8 C.F.R. § 316.10(b)(3)(i-ii)(2003).

### 1.  False Testimony

Interpreting 8 U.S.C. § 1101(f)(6) the Supreme Court, in *Kungys v. United States*, 485 U.S. 759, 780 (1988), established that there is no materiality requirement for false testimony under section 1101(f)(6), as a lack of good moral character appears "whenever there is subjective intent to deceive, no matter how immaterial" the testimony.[2]  The Court continued:

---

[2] Respondent has attempted to distinguish *Kungys* in that the case involved denaturalization, in which the burden of proof rests on the government to establish that denaturalization is warranted. In *Kungys*, though, the court considered the government's claim of "illegal procurement" as a justification for denaturalization. Under that claim, the Court had need to examine the requirements
(continued...)

A literal reading of the statute does not
produce draconian results, for several reasons.
First, "testimony" is limited to oral
statements made under oath.  The United States
concedes that it does not include "other types
of misrepresentations or concealments, such as
falsified documents or statements not made
under oath."  Supplemental Brief for United
States 3.  See, *e.g.*, *Sharaiha v. Hoy*, 169
F.Supp. 598, 601 (SD Cal.1959); *Matter of Ngan*,
10 I. & N. Dec. 725, 726 (1964); *Matter of
G-L-T-*, 8 I. & N. Dec. 403, 404-405 (1959). See
also *Ensign v. Pennsylvania*, 227 U.S. 592, 599,
33 S.Ct. 321, 322-323, 57 L.Ed. 658 (1913).
Second, § 1101(f)(6) applies to only those
misrepresentations made with the subjective
intent of obtaining immigration benefits. As
the Government acknowledges:
"It is only dishonesty accompanied by this
precise intent that Congress found morally
unacceptable. Willful misrepresentations made
for other reasons, such as embarrassment, fear,
or a desire for privacy, were not deemed
sufficiently culpable to brand the applicant as
someone who lacks good moral character."

*Kungys*, 485 U.S. at 780 (citations omitted).  Although *Kungys*

concerned denaturalization, courts examining naturalization cases

have followed the *Kungys* standard to determine what constitutes

false testimony.   In *Olmedo v. Immigration and Naturalization

Services*, the United States Court of Appeals for the Fourth Circuit

held that the petitioner made false statements with the intent to

obtain immigration benefits when he stated that he had not harbored

anyone illegally in the United States nor did he know the

whereabouts of his brother, who had gained unlawful entry into the

---

²(...continued)
*for naturalization* under 8 C.F.R. § 1101(f)(6). *See Kungys*, 485
U.S. at 779-82.

United States.  No. 89-2852 904, 1990 WL 76576, at *1 (4th Cir. May 24, 1990) (Unpublished Decision).  The petitioner, though, in fact worked with his brother and was helping him remain unlawfully in the United States, thus the court ruled that he lacked good moral character.  *Id.*

In *Chan v. Immigration and Naturalization Serv.*, No. 00 MISC 243(FB), 2001 U.S. Dist. WL 521706, at *5-7 (E.D.N.Y. May 11, 2001), the Eastern District of New York reversed an administrative denial of a naturalization application based on the petitioner's inconsistent sworn statements regarding his marriages and arrest record.  The court ruled that the statements were not "aimed to deceive the INS; rather they appeared to be the consequence of confusion, [and] misunderstanding." *Id.* at *7.  Particularly, the court found that an applicant intent on deceiving immigration officials to facilitate his naturalization would not engage in such a pattern of inconsistent statements.[3]

In *Plewa v. Immigration and Naturalization Serv.*, 77 F.Supp.2d 905, 910 (N.D.Ill. 1999), the Northern District of Illinois also reversed the INS's denial of the petitioner's application for naturalization.  The petitioner, relying on the erroneous advice of

---

[3]    *Id*.  *But see Ansah v. Ashcroft*, No. 03-60299, 2004 U.S.App. WL 231295, at *688 (5th Cir. Feb. 5, 2004)(unpublished)(holding that concealment of a fraudulent marriage on the petitioner's naturalization application, which she testified orally as true, showed an intent to deceive because she *knew* that disclosure of the fraudulent marriage would have resulted in a denial).

counsel, initially denied having ever been arrested; yet, she readily acknowledged her arrest at her second hearing once she learned of the problem. *Id.* at 907-908. The court in *Plewa*, applying the standards set forth in *Kungys*, ruled that the petitioner's statements under the totality of the circumstances were not "a 'lie' or 'dishonesty' made with the subjective intent of obtaining immigration benefits."[4]

### a. False Testimony Regarding Triphena and Cathay Cole

Petitioner stated during his October 21, 2003 interview that he had "six" children. (Paper 6, Ex. 3, at 3). The birth certificates for two of those children, Triphena and Cathay, were not registered until May 7, 2001. Petitioner contends that he did not list them on his 1994 Application for an Immigrant Visa, nor was he able to obtain birth certificates until much later, because their mother, Mary (Marie) Cole did not acknowledge that Petitioner was the children's father at the time of their birth. (Paper 6, Ex. 4, at 2). Mary subsequently disappeared in the civil war in Sierra Leone in 1996 and is presumed dead. (*Id.*). After Mary's

---

[4] *Id.* at 910. *See also Deluca v. Ashcroft*, 203 F.Supp.2d 1276, 1280. (M.D.Ala. 2002)(ruling that although petitioner had not admitted to being arrested for theft in her application, when asked specifically in her interview, the petitioner admitted to the crime and therefore did not intentionally attempt to deceive the INS in her answer to this question); *Cacho v. Ashcroft*, 403 F.Supp.2d 991, 997 (D.Hawaii 2004) (holding that the petitioner's omission of details of the extent of his sexual battery of an underage girl fifteen years prior were not subjectively manipulated by him with the hopes of improving his chances of gaining citizenship, as he admitted to the crime and the guilty plea).

disappearance, Petitioner's mother took custody of the children, and her investigation revealed that petitioner was their father. (Paper 8 ¶ 3). She took the children to Banjul, Gambia in 1999 to escape the fighting. In 2001, she was finally able to obtain delayed registration of their births. (Paper 6, Ex. 4, at 2). The girls' birth certificates identify their mother as "Marie Cole," not "Mary Cole," as Petitioner told the USCIS officers. Petitioner contends that "Marie Cole" and "Mary Cole" is the same person, as he uses the names interchangeably. (Paper 1 ¶ 7).

Respondent argues that Petitioner referred to *his* mother as Marie Cole in his statement in support of his request for a rehearing. (*See* Paper 6, Ex. 4, at 3). This contradicts Petitioner's birth certificate, which lists him as the child of "Nancy Ina Cole nee Haward." (Paper 6, Ex. 7). The record is unclear, however, as to which name Petitioner used to refer to his mother in his two oral interviews.

In any event, Petitioner now asserts that his mother's name is Nancy Ina Cole, his stepmother's name is Marie Cole, (paper 8 ¶ 3), and the mother of the Triphena and Cathay is or was known by Marie or Mary Cole (paper 1 ¶ 7).

Unlike *Olmedo*, in which the petitioners knowingly made false statements, the record here is potentially similar to *Plewa* and *Chan*, in which the petitioners did not provide false statements with the subjective intent to deceive. Despite his confusing statements,

15

Petitioner did not deny his parentage of Triphena and Cathay at any point in which he knew the children to be his, and he provided a reasonable explanation for the delay in the registration of their birth certificates.  Further, there is a genuine issue of fact as to when and how Petitioner referred to his mother or stepmother during the naturalization application process.

When viewing the evidence in the light most favorable to Petitioner, a reasonable factfinder could conclude that Petitioner's testimony regarding Triphena and Cathay was not given falsely with the intent to obtain immigration benefits.

**b. False Testimony Regarding Eugenia Cole and her Support.**

On Petitioner's 1994 Application for an Immigrant Visa, Petitioner included Eugenia among his children.  (Paper 6, Ex. 6, at 1).  Petitioner contends, however, that Eugenia subsequently went missing in 1994 during the Civil War in Sierra Leone and that she is presumed dead.  (Paper 1 ¶ 7).  Accordingly, the lack of evidence of his financial support for Eugenia is understandable.

The question of whether Petitioner provided false testimony regarding Eugenia remains.  On Petitioner's 2003 Application for Naturalization, N-400, Part 9A, Petitioner listed his total number of children that he has had as "six."  (Paper 6, Ex. 2, at 6).  He was asked to list all of his children in Part 9B, in which he listed seven names, with one marked deceased.  (*Id*.)  Petitioner's response was plainly inconsistent with his own admission that by 2003, he had

16

fathered a total of eight children. (Paper 1 ¶ 5). Two of these children, Margaret and Sydney, had died, and a third, Eugenia, was presumed dead. (*Id.*). Curiously, Petitioner included "Sydney," marked as deceased in Part 9B of the N-400 and included "Margaret" not marked as deceased; yet, he excluded Eugenia. (Paper 6, Ex. 2, at 6). Further, at the October 21, 2003 interview, when questioned if he had any other children (beyond the seven listed in Part 9B of the N-400), Petitioner responded "No" and the examiner noted as change number seven "no other children" on the N-400. (Paper 6, Ex. 2, at 6).

Petitioner contends in his verified petition that although he failed to list Eugenia in Part 9B, he *did* include her among the "six" that he listed in Part 9A and declared orally as his number of children during both interviews. (Paper 1 ¶ 7). He states that he included Eugenia because he had listed her on his previous Application for Immigrant Visa and was "trying to be extremely accurate."[5] However, when questioned about Eugenia directly in the February 2, 2006 interview, Petitioner acknowledged Eugenia as his child and then said that would make "seven." (Paper 6, Ex. 5, at 3). Petitioner then informed the officer Eugenia was missing and presumed dead. (Paper 1 ¶ 7). Petitioner contends the discrepancy

---

[5]   (Paper 1 ¶ 7). That would imply that he did not include Sydney and Margaret, both deceased, among his "six" children, and also that not marking Margaret as deceased on his N-400 was an error, as well as omitting to write down Eugenia in part 9B of the N-400.

over his children was "based on misunderstanding and mis-communication [sic] between himself and the hearing . . . [officer] who conducted the interview." (*Id.*).

The Petitioner's statements as to the number and composition of his children were inconsistent. However, the only child not listed on his N-400, Eugenia, was included among his children in his 1994 Application for Immigrant Visa, and when questioned about her directly in the February 2, 2006 interview, he readily acknowledged Eugenia as his child. The purpose of §1106(f)(6) is not to prevent false data from entering the naturalization process, but to identify a lack of good moral character. *Plewa*, 77 F.Supp. 2d at 910. Petitioner's statements, when viewed in the light most favorable to him, do not necessarily show dishonesty accompanied by the precise intent to obtain immigration benefits. *See, e.g.*, *Chan*, 2001 U.S. Dist. WL 521706, at *5-7; *see also Kunygs*, 485 U.S. at 780 ("It is only dishonesty accompanied by this precise intent that congress found morally unacceptable. Willful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy were not deemed sufficiently culpable to brand the applicant as someone who lacks good moral character" (citations omitted)). There is a genuine issue of fact as to whether Petitioner's inconsistencies were merely misstatements or whether they carried a deceitful intent to obtain immigration benefits. Thus, Respondent is not entitled to judgment as a matter of law on the issue of

whether the Petitioner lacks good moral character because he made false statements with the intent of obtaining immigration benefits.

**2. Having an Extramarital Affair that Tended to Destroy an Existing Marriage**

Respondent argues that Petitioner has provided no proof that Petitioner did not engage in extramarital affairs that tended to destroy an existing marriage to (1) Eugenia O'Rielly, and (2) Mona Gaffney.  Petitioner contends that neither marriage was still a viable, existing marriage at the time of his other romantic relationships.

In *Nemetz v. Immigration and Naturalization Serv.*, 647 F.2d 432, 436 (4th Cir. 1981)(interpreting prior statute[6]), the Court stated:

> Congress has not said that fornication is sufficient to defeat good moral character. Congress has not found the fact of sexual intercourse unblessed by marriage to offend the common conscience; (at least, not to such a degree as to reflect upon the character of the offender).  Rather it has found offensive that extramarital intercourse which tends to destroy an existing marriage; which evidences disregard of marital vows and responsibilities.

Under 8 C.F.R. § 316.10(b)(3)(ii), having an extramarital affair that tended to destroy an existing marriage acts as a bar to finding good moral character, unless the applicant can establish

---

[6] While § 1101(f)(2) has been repealed, CIS regulations, in 8 C.F.R § 316.10(b) (2003), mandate a similar requirement to that the Fourth Circuit was interpreting in *Nemetz*. Such regulations are entitled to deference. *See Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837, 843-44 (1984).

extenuating circumstances.  The Adjudicator's Field Manual of the
CIS states that "[i]f the lawful marriage ceased to be viable and
intact before the commission of the adultery, such sexual misconduct
without cohabitation does not support a finding of lack of good
moral character."  INS Adj. Field Manual ch. 73.6 (2006). *See also*
*Moon Ho Kim v. Immigration and Naturalization Serv.*, 514 F.2d 179,
181 (D.C.Cir. 1975) (holding that the applicable uniform federal
standard is that of "extra-marital intercourse which tends to
destroy an existing, *viable* marriage") (emphasis added).

Respondent argues that Petitioner was married to Eugenia
O'Rielly when he fathered Eugenia Cole to Joyce Tucker and he has
produced no proof that this affair did not destroy his marriage.
The record is unclear as to the timing of Petitioner's relationship
with Joyce Tucker.  However, based on the normal term of pregnancy
(nine months), Eugenia Cole, born March 31, 1988 was conceived
sometime in July 1987 — months before Petitioner's September 25,
1987 marriage to Ms. O'Rielly.  Thus, on this evidence alone, a
reasonable factfinder could infer that Petitioner's relationship
with Ms. Tucker did not occur during the course of Petitioner's
first marriage to Ms. O'Rielly.

Petitioner states in his verified petition that he and Ms.
O'Rielly separated shortly after their marriage because Ms.
O'Rielly's parents were extraordinarily meddlesome.  (Paper 1 ¶ 7).
Only after the estrangement, Petitioner claims, did he begin a

20

relationship with Mary (Marie) Cole, by whom he fathered at least two children. (*Id.*). Drawing all reasonable inferences in Petitioner's favor, a reasonable factfinder could determine that Petitioner only began a relationship with Ms. Cole after his marriage to Ms. O'Rielly ceased to be viable. *See Moon Ho Kim*, 514 F.2d at 181.

Petitioner married Mona Gaffney on September 20, 1990. Petitioner claims that the relationship was originally based on love, but "the cultural differences between . . . [his] African heritage and the American heritage of his wife were too much to overcome." (Paper 1 ¶ 7 ). Petitioner asserts that the two separated, and only then did he rekindle a relationship with Eugenia O'Rielly. (*Id.*). He and Ms. O'Rielly shared a cultural background and now that Ms. O'Rielly was in the United States, the couple was free from the interference of Ms. O'Rielly's parents. (*Id.*). Petitioner divorced Ms. Gaffney on April 18, 1995, later remarrying Ms. O'Rielly on August 18, 1995. (*Id.*). Taking the facts in the light most favorable to Petitioner, it is plausible that his relationship with Ms. O'Rielly did not destroy an existing, viable marriage to Ms. Gaffney. Thus, Respondent is not entitled judgment as a matter of law on the issue of whether Petitioner lacks good moral character on the grounds that he had extramarital affairs that tended to destroy an existing marriage.

21

## IV. Conclusion

For the foregoing reasons, Respondent's motion for summary judgment will be denied.  A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
